UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHANIKA GLENN, on behalf of herself and all others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>MONTERREY SECURITY CONSULTANTS, INC.,<br><br>   Defendant. | No. 24-cv-8260<br><br>Judge April M. Perry |

## OPINION AND ORDER

This is an overtime wage action brought by an employee, Shanika Glenn ("Plaintiff") against her employer, Monterrey Security Consultants, Inc. ("Defendant"). Before the Court is Plaintiff's motion for court-authorized Fair Labor Standard Act ("FLSA") opt in notice. Doc. 34. For the reasons set forth below and at oral hearing, the motion is granted.

## BACKGROUND

Defendant provides security services in and around Chicago, Illinois and South Bend, Indiana. Doc. 1 ¶ 2. Plaintiff alleges that she has worked for Defendant as a non-exempt security officer. *Id*. ¶ 17. Defendant pays Plaintiff an hourly wage, plus a health and welfare payment per hour worked. *Id*. ¶¶ 4-5. Plaintiff is also entitled to overtime pay at one-plus-one-half rate for all hours worked each week beyond forty hours. *Id*. ¶ 6. Plaintiff alleges that Defendant systematically underpaid her overtime by not including her health and welfare payments in her regular rate of pay. *Id*. ¶ 7. Based on these underpayments, Plaintiff brought this FLSA collective action on behalf of herself and a collective of similarly situated persons.

Defendant filed a motion to dismiss, which the Court denied. Doc. 48. On July 16, 2025, the Court held oral argument on Defendant's motion for court-authorized FLSA opt in notice, among other issues. At hearing and in its response brief, Defendant argued notice would be improper because certain Defendant employees are members of the Service Employees International Union, Local 1 ("SEIU") and subject to arbitration clauses in certain employer-specific SEIU collective bargaining agreements. In particular, Defendant identified two collective bargaining agreements covering Defendant employees assigned to work at certain sites run by the Chicago Transit Authority ("CTA Agreement"), Doc. 56 at 16–46, and by the Building Owners and Managers Association of Chicago ("BOMA Agreement"), *id.* at 50–91.

The CTA Agreement requires employees to resolve disputes through a multi-step process. *See* Doc. 56 at 28–29. Grievances subject to this procedure are defined in the CTA Agreement as "dispute[s] between the Employer and an employee regarding the applications of the Employer's rules and regulations or the meaning or application of any provision of this Agreement." *Id*. at 28. Elsewhere, the CTA Agreement states further that covered disputes include "wage and hour claims or disputes, which shall include statutory claims over the payment of wages for all time worked … overtime pay … and all other wage hour related matters." *Id*. at 30. The CTA Agreement also provides that "[t]he parties agree that any employee's … wage and hour claims or disputes relative to a violation of wage and hour law shall be resolved through the arbitration process provided for in this Agreement to the extent permitted by law and the employees … shall have access to the arbitration provision in this Agreement for the purpose of resolving any wage and hour claims." *Id*. at 30–31.

To submit a grievance, employees subject to the CTA Agreement must first furnish a "written statement … to the Employer's Branch Manager or his/her designee, within thirty (30)

2

days following the occurrence of the subject matter of the grievance." *Id*. at 29. Once furnished, a CTA manager is required to answer within 15 days. *Id*. If the matter remains unresolved, it may be escalated within 15 days, after which a meeting will be scheduled between CTA's Area Vice President and an SEIU representative. *Id*. If still unresolved, the grievance may be escalated one more time to the CTA's Regional Vice President, who will have fifteen days to answer the grievance. *Id*. Only if still unsettled or if both the CTA and the Union agree to waive escalation to the Regional Vice President may the Union appeal the grievance to an arbitrator, provided it gives notice to CTA of its intent to do so within ten days. *Id*.

The BOMA Agreement also provides a grievance and dispute procedure. *See id*. at 72–74. In terms of covered subject matter, this procedure covers any "grievance pertaining to any difference or dispute, which may arise under this Agreement." *Id*. at 73. No language or provisions appear in the BOMA Agreement stating that statutory wage and hour claims are to be resolved through the grievance procedure. The BOMA Agreement requires an aggrieved employee to, as a first step, "present such grievance as soon as reasonably possible and, in any event, within ten (10) calendar days following the event which gives rise to its occurrence or after such employee(s) involved first acquired knowledge concerning such event." *Id*. at 73. If the matter is not settled at the first step, and SEIU desires to pursue the matter further, the grievance may be further presented to the employer "within thirty (30) calendar days following the event which gave rise to its occurrence," after which the employer has 15 days to answer. *Id*. If the matter remains unsettled, the SEIU may then within 30 days after receiving a response from the employer "serve a written demand for arbitration." *Id*. Finally, the BOMA Agreement notes that "[g]rievances … not presented or appealed within the time limits set forth [under the BOMA Agreement] shall be considered withdrawn and abandoned." *Id*. at 74.

Defendant also argued in its briefing and at oral argument that either some or all of the time, Defendant's unionized employees do not receive health and welfare payments from Defendant.

## LEGAL STANDARD

The Fair Labor Standards Act allows plaintiffs to pursue claims for unpaid overtime as a collective action on behalf of themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). "A collective action is similar to, but distinct from, the typical class action," with one difference being that employees who "wish to be included in a collective action must affirmatively opt-in to the suit." *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010). The FLSA does not set forth procedures for how to handle collective actions, and so "district courts have wide discretion in managing … collective actions." *Weil v. Metal Techs, Inc.*, 925 F.3d 352, 357 (7th Cir. 2019).

Courts in the Northern District of Illinois apply a two-step process for certifying an FLSA collective action. At the first step, a plaintiff "must make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Grosscup v. KPW Mgmt., Inc.*, 261 F.Supp.3d 867, 870 (N.D. Ill. 2017). Courts employ a "lenient interpretation of the term 'similarly situated' at this stage" and allow a plaintiff to make their showing through "some evidence in the form of affidavits, declarations, deposition testimony, or other documents." *Williams v. TopHat Logistical Sols., LLC*, 703 F.Supp.3d 913, 923 (N.D. Ill. 2023). At this step, "the court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant." *Bergman v. Kindred Healthcare, Inc.*, 949 F.Supp.2d 852, 855–56 (N.D. Ill. 2013). Once a plaintiff has made such a showing, "the Court may conditionally

certify the case as a collective action and allow the plaintiffs to send notice of the case to similarly situated employees who may then opt in as plaintiffs." *Williams*, 703 F.Supp.3d at 923; *see also Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 974 (7th Cir. 2011) (the "conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action.").

## ANALYSIS

### I. Arbitration Agreements

Defendant argues court-approved notice to Plaintiff's proposed FLSA collective is improper under *Bigger v. Facebook*, which held that a district court may not authorize notice to any proposed collective members who agreed to arbitrate their FLSA claims. 947 F.3d 1043, 1050 (7th Cir. 2020). In *Bigger*, the defendant employer asserted that some of the proposed collective members had entered binding arbitration agreements and so waived their right to pursue their FLSA claims in court. *Id*. at 1048. On appeal from the district court's decision to conditionally certify a collective and authorize notice to employees that had agreed to arbitrate, the Seventh Circuit reversed. It held that a "court may not authorize notice to individuals whom the court has been shown entered mutual arbitration agreements waiving their right to join the action," and that a defendant must be given "an opportunity to make that showing." *Id*. at 1050. When parties dispute the validity or existence of such agreements, "the court must permit the parties to submit additional evidence on the agreements' existence and validity." *Id*. To defeat notice, the defendant "has the burden to show, by a preponderance of the evidence, the existence of a valid arbitration agreement for each employee it seeks to exclude from receiving notice." *Id*.

5

If the "record reveals that nothing in the agreement would prohibit that employee from participating in the action," the court may authorize notice.

Plaintiff argues *Bigger* only pertains to individual arbitration agreements, not collective bargaining agreements. The Court disagrees that *Bigger* is so limited. A collective bargaining agreement can restrict an employee's right to pursue their claims in court if it "explicitly states that an employee must resolve his statutory … rights through the grievance procedure delineated in the collective bargaining agreement." *Vega v. New Forest Home Cemetery, LLC*, 856 F.3d 1130, 1134 (7th Cir. 2017), citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 263-64 (2009). Plaintiff also argues that even if *Bigger* applied, Defendant has failed to show "the existence of a valid arbitration agreement for *each employee* it seeks to exclude from receiving notice." Doc. 59 at 5, citing *Bigger*, 947 F.3d at 1050 (emphasis added). At oral argument, Defendant asserted that it has made a sufficient showing of which employees it seeks to exclude, and the Court agrees that to the extent the CTA Agreement and BOMA Agreement bind SEIU employees to arbitration, Defendant has made the necessary showing of the specific employees to whom notice would not be proper.[1]

Having determined that *Bigger* analysis is merited, the Court turns to whether the two agreements introduced by Defendant—the CTA Agreement and BOMA Agreement—compel any of Defendant's employees to arbitrate their statutory FLSA claims. Plaintiff has raised two arguments why they do not.

---

[1] As a practical matter, the Court understands Defendant to currently possess the records necessary to determine which of its employees are subject to SEIU collective bargaining agreements. Accordingly, the Court expects that if it found notice would be improper to any proposed collective members based on their SEIU collective bargaining agreements, Plaintiff and Defendant could resolve among themselves how to share information about these employees and ensure that these individuals do not receive unauthorized notice.

First, Plaintiff argues that the collective bargaining agreements in this case do not evidence a "clear and unmistakable" intent that FLSA claims be arbitrated. *See Vega v. New Forest Home Cemetery, LLC*, 856 F.3d 1130, 1134 (7th Cir. 2017). General language providing for out-of-court resolution of "matters under dispute" or "[a]ny dispute concerning or arising out of … this Agreement" fails to demonstrate a clear and unmistakable intent to require employees to resolve statutory claims through contractual channels. *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80–82 (1998). Even language requiring employees to arbitrate or otherwise resolve disputes "concerning pay, hours, or working conditions" does not meet the standard if there is no language indicating that this includes statutory claims. *Vega*, 856 F.3d at 1134–35; *Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 437 (7th Cir. 2021) ("It is neither unattainable nor unreasonable to expect parties to a collective bargaining agreement to clearly state those statutory claims they intend to confine to arbitration.").

Applying those principles here, the Court concludes that the CTA Agreement clearly and unmistakably provides for arbitration of statutory wage and hour claims, but that the BOMA Agreement does not. The BOMA Agreement states only that the grievance procedure pertains to "any difference or dispute, which may arise under this Agreement." Doc. 56 at 73. Plainly, this general statement does not meet the *Vega* bar. As for the CTA Agreement, Plaintiff argues that it does not explicitly reference FLSA claims, but the Court does not believe this strictly necessary. The CTA Agreement states that the outlined procedures are to cover "statutory claims over the payment of wages for all time worked … overtime pay … and all other wage hour related matters." *Id*. at 30. While the specific statutes are not spelled out by name, this language is explicit enough for the Court to infer that the parties intended statutory wage claims, including FLSA claims, to proceed through the CTA Agreement's grievance and arbitration procedures.

7

Plaintiff also notes that the CTA Agreement wavers in its definition of disputes subject to grievance procedures, in one breath reaching only "dispute[s] between the Employer and an employee regarding the applications of the Employer's rules and regulations or the meaning or application of any provision of this Agreement," *id.* at 28, and in the next including "statutory claims over … overtime pay … and all other wage hour related matters." *Id.* at 30. While the Court agrees that there is some inconsistency, the Court is persuaded that the CTA Agreement's further statement that the "parties agree that any employee's … wage and hour claims or disputes relative to a violation of wage and hour law shall be resolved through the arbitration process," *id.* at 30–31, provides enough to conclude that the CTA Agreement clearly and unmistakably assigns employees' FLSA claims to arbitration.

But even if the CTA Agreement clearly and unmistakably compelled union employees to arbitrate their FLSA claims, Plaintiff argues FLSA claims still cannot be resolved through these procedures due to the short time limits placed on employees to bring wage-related claims. The Seventh Circuit has recognized that the FLSA is uniquely "designed to defeat rather than implement contractual arrangements" and so held that parties may not by agreement "waive the statutory wages the FLSA promises, whether directly or indirectly." *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 994 (7th Cir. 2024); *see also Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 606 (6th Cir. 2013) ("An employment agreement cannot be utilized to deprive employees of their statutory FLSA rights."). For these reasons, agreements in the employment context that effectively shorten the FLSA's limitations period have been held invalid. *Id.* at 606–7 (invalidating provision in agreement providing only six months for employees to bring FLSA claims).

Here, the CTA Agreement requires employees to file a written statement of grievance "within thirty (30) days following the occurrence of the subject matter of the grievance." Doc. 56 at 29. This is a far shorter window than the two-year statute of limitations for FLSA claims (or three years for willful violations). Accordingly, it operates as a waiver of the statutory wages promised by the FLSA and may not be validly applied to compel arbitration of employee FLSA claims.[2]

At oral argument, Defendant conceded that the CTA Agreement's 30-day deadline to submit wage-related grievances was too short, but argued that even if so, other courts choose to sever problematic language from arbitration agreements in the interest of preserving the enforceability of an arbitration agreement. The lead case on this matter appears to be *Castellanos v. Raymours Furniture Co.*, 291 F.Supp.3d 294 (E.D.N.Y. 2018). In *Castellanos*, plaintiffs brought FLSA claims against an employer, which moved to compel arbitration. The at-issue arbitration agreement contained a 180-day limitation period for asserting claims in arbitration, which the district court found to undermine the FLSA's remedial scheme and was thus unenforceable as to FLSA claims. *Id*. at 301. Following Second Circuit precedent, and consistent with the express wishes of plaintiffs and defendant in that action, the district court elected to sever the 180-day limitation provision from the agreement and compelled the matter to arbitration. *Id*.

Having reviewed *Castellanos*, the Court finds that while severance may have been proper in that case, it is not appropriate here. First, the Seventh Circuit has not yet decided the issue: in

---

[2] Though the Court does not read the BOMA Agreement as reaching FLSA claims, suffice to say that the BOMA Agreement also improperly curtails FLSA's substantive protections. It provides employees just ten days to present grievances, and commands that grievances not presented within time limits "shall be considered withdrawn and abandoned." *Id*. at 73–74.

9

*Rodgers-Rouzier*, it specifically declined to opine on whether a statute-of-limitations waiver in an arbitration agreement "would be severable or render the entire agreement void." 104 F.4th at 995. Second, in *Castellanos* both the FLSA plaintiffs and the defendant favored severing the problematic provision. *See Castellanos*, 291 F.Supp.3d at 301. Third, in *Castellanos* all of the parties whose rights were being decided were present to debate the merits (and extent) of how the severability clause should be applied. Here, having learned of defects in the CTA Agreement's arbitration provisions with respect to FLSA claims, Defendant proposes that the problem provision can and must be cured (and notice averted) by severing the offending 30-day time limit for bringing claims. But if this Court were to accept Defendant's argument as a basis for denying *notice*, the employees whose rights under FLSA would be directly affected would never know that the CTA Agreement does not actually mean what it says. That is, with respect to FLSA claims, the employees would never know that Defendant has conceded that they have the right to pursue FLSA claims for at least two years of unpaid wages, rather than just the 30 days provided for by agreement. If Defendant is inclined to sever an invalid contract provision, it should have to make that offer to the other party bound to the contract, perhaps in its own motion to compel once notice has been provided. This is consistent with the savings clause in the CTA Agreement, which dictates that in the event a term of the agreement is invalid, "both parties agree … to agree on a revised provision that as closely as legally possible mirrors the purpose of such invalidated provision(s)." Doc. 56 at 45. Perhaps then, as in *Castellanos*, some plaintiffs may even agree to proceed to arbitration.

  In summary, the Court concludes that notice is appropriate to the class as proposed by Plaintiff. The BOMA agreement does not reach FLSA claims, and the CTA Agreement as written is invalid as it would effectively deprive Defendant employees of their substantive FLSA

rights. Accordingly, Defendant employees who are subject to these agreements are still similarly situated to the rest of Plaintiff's proposed FLSA collective and therefore entitled to receive notice.

## II. Health and welfare payments

Defendant also argues that some of its employees do not receive health and welfare payments, or that they only receive such payments when assigned to certain work sites. According to Defendant, this would result in individualized inquiries that will frustrate the efficient management of this action.

The Court is not persuaded by these arguments, at least at this stage of litigation. Plaintiff seeks authorization to notify only employees "paid an hourly health and welfare payment," so plainly employees who have never received a payment will not be notified, as Defendant seems to fear.[3] The common policy alleged by Plaintiff is Defendant's practice of paying health and welfare payments directly without including those amounts in overtime calculations. Doc. 1 ¶ 8. Plaintiff's exhibits show Defendant does have a policy of making direct health and welfare payments to employees, and that is how Plaintiff has defined her collective. *See, e.g.*, Doc. 35-1 at 7 (pay statement for Plaintiff), 15 (pay statement for Princess Bell), 27 (pay statement for Yashica Shona Mackey). As for Defendant employees who may have worked at different sites, receiving direct payments sometimes but not others, these employees are still similarly situated

---

[3] At oral argument and in its briefing, Defendant explained that an employee may receive a health and welfare payment while assigned to work at one site, but may not receive one once reassigned to another site for a different Defendant client. To be clear, if an employee performs work at different sites and received at least one health and welfare payment for work at one site, that employee should be notified even if they did not receive such a payment for work at other sites.

with the rest of the FLSA collective as to the times they were paid—but did not receive overtime for—health and welfare payments, even if their quantum of recovery may differ.

Boiled down, the Court sees these arguments as factual disputes about who is similarly situated, which the Court does not resolve at the conditional certification stage. *Bergman v. Kindred Healthcare, Inc.*, 949 F.Supp.2d 852, 855–56 (N.D. Ill. 2013). If meaningful differences among the collective emerge through discovery, Defendant is free to make those arguments, at which point the Court will decide whether to revoke conditional certification under the more stringent standards applicable at the second stage of collective certification. *See Grosscup v. KPW Mgmt. Inc.*, 261 F.Supp.3d 867, 876 (N.D. Ill. 2017).

## CONCLUSION

For the foregoing reasons and those set out at oral argument, Plaintiff's motion for court-authorized FLSA opt-in notice is granted, and the Court orders as follows:

1. The Court authorizes opt-in Notice to be sent to:

    All current and former hourly employees of Defendant who during the prior three years and one hundred and forty days worked for Defendant over forty (40) hours in one or more workweeks and who in the same workweek were paid an hourly health and welfare payment ("Collective Members").

2. On or before August 13, 2025, Defendant Monterrey Security Consultants, Inc. shall produce to Plaintiff, in usable electronic format such as .csv or an Excel file, the names, employment start and end dates, last known addresses, personal email addresses (if available), and telephone/cell phone numbers of the Collective Members;

3. Plaintiff is authorized to send notice and consent forms, in a form consistent with that previously submitted to and approved by the Court, by mail, email and text message;

4. Plaintiff is authorized to create a website that will host the Notice and allow potential collective members to submit the Consent to Join Form electronically, including by QR code and via the case website; and

5. Plaintiff is authorized to send a reminder notice via email and text message to potential Collective Members who have not yet opted into the case thirty (30) days prior to the close of the opt-in period.

Dated: July 21, 2025

_____
APRIL M. PERRY
United States District Judge